**HERMAN JONES LLP**
SERINA M. VASH
153 Central Avenue #131
Westfield, NJ 07090
svash@hermanjones.com
Telephone: (404) 504-6516
Facsimile: (404) 504-6501
svash@hermanjones.com

[Additional Counsel on Signature Page]

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PEKIN POLICE PENSION FUND, Derivatively on Behalf of PRUDENTIAL FINANCIAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHARLES F. LOWREY, ROBERT M. FALZON, KENNETH Y. TANJI, CHRISTINE A. POON, GILBERT F. CASELLAS, KARL J. KRAPEK, THOMAS J. BALTIMORE, JR., MARTINA HUND-MEJEAN, DOUGLAS A. SCOVANNER, SANDRA PIANALTO, PETER R. LIGHTE, GEORGE PAZ, MICHAEL A. TODMAN, JOHN R. STRANGFELD, and MARK B. GRIER, <br><br> Defendants, <br><br> -and- <br><br> PRUDENTIAL FINANCIAL, INC., a New Jersey Corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff, Pekin Police Pension Fund, located at 111 S. Capitol Street, #100, Post Office Box 579, Pekin, Illinois 61554, by its attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This Complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Prudential Financial, Inc. ("Prudential" or the "Company") against certain of its officers and directors for violation of securities law, breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Prudential's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Prudential to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Prudential is one of the largest life insurers in the United States.  The Company's life insurance business, or Individual Life business segment, is encompassed by its Financial Wellness franchise— its core operation in the United States.  Prudential's Individual Life business segment develops and distributes term life, variable life, and universal life insurance products and, over the years, has become an important part of the Company's business.

3.      In order to increase the size of its Individual Life segment, in 2013, Prudential acquired The Hartford Financial Services Group, Inc.'s ("Hartford") individual life insurance

business for $615 million.  As a result, the Company assumed approximately 700,000 insurance policies with a face amount of over $140 billion, receiving both the right to collect customer premiums, as well as the obligation to pay claims.

4.      Historically, the Company's Individual Life segment has been consistently profitable, with the segment achieving an adjusted operating income ("AOI") ranging from $384 million to $635 million each year from 2011 to 2015.  Following the integration of the legacy Hartford policies in 2015, however, Prudential reported poor results for the Individual Life segment in 2016 and 2017.  The poor results arose from charges taken during the Company's actuarial review that occurs during the second quarter of each year.  The Individual Defendants (as defined herein) attributed these charges to the implementation of new modeling and accounting standards, which they indicated were primarily one-time adjustments for the universal life policies acquired from Hartford.  Notwithstanding these apparent problems, the Individual Defendants remained upbeat about the Hartford acquisition.

5.      From February 15, 2019 to August 2, 2019, the Individual Defendants made a series of improper statements in Prudential's public filings with the SEC, during earnings conference calls, and to analysts.  In particular, these fiduciaries reported Prudential's financial results and reserves for future policy benefits while representing that these reported metrics were consistent with U.S. Generally Accepted Accounting Principles ("GAAP").  The Individual Defendants also represented that the Company's balance sheet was "rock-solid," that there were "no systemic issues with underwriting or mortality assumptions" and that, if anything, Prudential's current reserves were greater than necessary.  In reality, however, the Company's reserves were insufficient and understated as a result of systemic mortality issues within the Hartford policies and abnormal adverse mortality experience within Individual Life.

Additionally, Prudential's reserve figures were understated while its financial results, particularly net income, operating earnings, and earnings per share ("EPS"), were overstated in violation of GAAP.

6.      The truth began to emerge on July 31, 2019, as the Company announced its second quarter 2019 financial results, which took into account Prudential's second quarter annual actuarial review.  These results included an EPS of just $3.14, missing analyst expectations.  The results included a charge of *$208 million* for changes in "mortality assumptions" in Individual Life.  During the Company's earnings conference call on August 1, 2019, the Individual Defendants revealed that the change in mortality assumptions would reduce earnings in the Individual Life segment by $25 million each quarter "for the foreseeable future."

7.      In the wake of these disclosures, Prudential's stock plunged more than 12.5%, or $12.75 per share, on August 2, 2019, to close at $88.56 per share compared to closing at $101.31 per share on July 31, 2019, erasing over *$5.12 billion* in market capitalization.

8.      Before the truth was revealed, between February 2019 and July 2019, while the Company's stock price was inflated due to the improper statements, Prudential repurchased 10.97 million shares of its own common stock.  This repurchase of inflated stock cost the Company *$1.07 billion*.

9.      As a direct result of the improper statements detailed herein, Prudential is now the subject of a consolidated federal securities class action lawsuit filed in the U.S. District Court for the District of New Jersey (the "Securities Class Action").  The Securities Class Action is brought on behalf of investors who purchased Prudential's shares at artificially inflated rates and alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act").  The amended Securities Class Action complaint was filed on June 3, 2020, and the action is currently pending.

10.     On April 14, 2020, pursuant to New Jersey law, plaintiff sent a letter to Prudential's Board of Directors (the "Board") demanding it to investigate and remedy the foregoing facts arising from the letter and to commence litigation against the corporate fiduciaries responsible for damaging the Company (the "Demand").  Counsel for the Board sent a letter dated April 27, 2020, responding to the Demand and incorrectly arguing that plaintiff is required to provide evidence of its ownership of Prudential stock. The letter also stated that the Board had formed a Special Committee to investigate the allegations of the Demand, but never stated when the review would be done.  Over ninety days have expired since the date of the Demand, and plaintiff has not received notice of the Board rejecting the Demand, nor any update on the status of the Special Committee's purported investigation.  Accordingly, in light of the Board's delay, plaintiff brings this action to timely address the wrongdoing discussed herein.

## JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claim asserted herein for violations of section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Prudential maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Prudential, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

14.     Plaintiff Pekin Police Pension Fund was a stockholder of Prudential at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Prudential stockholder.

**Nominal Defendant**

15.     Nominal defendant Prudential is a New Jersey corporation with principal executive offices located at 751 Broad Street, Newark, New Jersey.  Prudential is a financial services and investment manager with approximately $1.551 trillion of assets under management as of December 31, 2019, and operations in the United States, Asia, Europe, and Latin America. Through its subsidiaries and affiliates, Prudential offers a wide array of financial products and services, including life insurance, annuities, retirement-related services, mutual funds, and investment management.  As of December 31, 2019, Prudential had an aggregate of 51,511 employees.

**Defendants**

16.     Defendant Charles F. Lowrey ("Lowrey") is Prudential's Chief Executive Officer, President, and a director and has been since December 2018, and Chairman of the Board and has been since April 2019.   Defendant Lowrey was also Executive Vice President and Chief Operating Officer of International Businesses from March 2014 to November 2018; Executive Vice President and Chief Operating Officer of U.S. Businesses from February 2011 to March 2014; Chief Executive Officer and President of Prudential Investment Management, Inc. from January 2008 to February 2011; Chief Executive Officer of Prudential Real Estate Investors from February 2002 to January 2008; and held various other positions at since joining the Company in 2001.  Defendant Lowrey is also named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant Lowrey knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.  In addition, defendant Lowrey knowingly, recklessly, or with gross negligence caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.  Prudential paid defendant Lowrey the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | Non-Equity Incentive Plan | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other | Total |
|------|--------|-------|---------------|---------------------------|--------------------------------------------------------------------------|-----------|-------|
| 2019 | $1,200,000 | $4,980,009 | $1,666,665 | $6,085,252 | $1,128,436 | $72,577 | $15,132,939 |

17.     Defendant Robert M. Falzon ("Falzon") is Prudential's Vice Chairman of the Board and has been since December 2018, and a director and has been since August 2019.  He was also Executive Vice President and Chief Financial Officer from March 2013 to November 2018; Senior Vice President and Treasurer from 2010 to 2013; and held various other positions since joining the Company in 1983.  Defendant Falzon is also named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Falzon knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.  In addition, defendant Falzon knowingly, recklessly, or with gross negligence caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.  Prudential paid defendant Falzon the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other | Total |
|---|---|---|---|---|---|---|---|
| 2019 | $1,000,000 | $3,960,144 | $1,325,304 | $4,754,861 | $938,263 | $104,406 | $12,082,978 |

18.     Defendant Kenneth Y. Tanji ("Tanji") is Prudential's Executive Vice President and Chief Financial Officer and has been since December 2018.  He was also Senior Vice President and Treasurer from March 2013 to November 2018; Senior Financial Officer of Prudential Annuities from 2003 to 2009; and held various other positions since joining the Company in 1988.  Defendant Tanji is also named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Tanji

knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.  In addition, defendant Tanji knowingly, recklessly, or with gross negligence caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.  Prudential paid defendant Tanji the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other | Total |
|------|--------|-------|---------------|----------------------------------------|------------------------------------------------------------------------|-----------|-------|
| 2019 | $600,000 | $1,560,046 | $522,102 | $1,643,475 | $491,659 | $50,093 | $4,867,375 |

19.     Defendant Christine A. Poon ("Poon") is Prudential's Lead Independent Director and has been since at least July 2020, and a Prudential director and has been since September 2006.  Defendant Poon knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.  In addition, defendant Poon knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.  Prudential paid defendant Poon the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $172,500 | $150,000 | $322,500 |

20.     Defendant Gilbert F. Casellas ("Casellas") is a Prudential director and has been since January 2001.  Defendant Casellas is a member of the Company's Audit Committee and has been since at least July 2020.  Defendant Casellas knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.   In addition, defendant Casellas knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.  Prudential paid defendant Casellas the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $173,750 | $150,000 | $1,100 | $324,850 |

21.     Defendant Karl J. Krapek ("Krapek") is a Prudential director and has been since January 2004.  Defendant Krapek knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.  In addition, defendant Krapek knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to repurchase the Company's

stock at artificially inflated prices.   Prudential paid defendant Krapek the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $180,000 | $150,000 | $5,000 | $335,000 |

22.    Defendant Thomas J. Baltimore, Jr. ("Baltimore") is a Prudential director and has been since October 2008.  Defendant Baltimore was also Prudential's Lead Independent Director from May 2017 to May 2020.  Defendant Baltimore knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.   In addition, defendant Baltimore knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.   Prudential paid defendant Baltimore the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $255,000 | $150,000 | $405,000 |

23.    Defendant Martina Hund-Mejean ("Hund-Mejean") is a Prudential director and has been since October 2010.  Defendant Hund-Mejean is Chairperson of the Company's Audit Committee and has been since at least July 2020 and a member of the committee and has been since at least March 2018.  Defendant Hund-Mejean knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development;

(iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.   In addition, defendant Hund-Mejean knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.   Prudential paid defendant Hund-Mejean the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $150,000 | $150,000 | $5,000 | $305,000 |

24.     Defendant Douglas A. Scovanner ("Scovanner") is a Prudential director and has been since November 2013.   Defendant Scovanner is a member of the Company's Audit Committee and has been since at least March 2018 and was Chairman of the committee from at least March 2018 to at least March 2020.   Defendant Scovanner knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.   In addition, defendant Scovanner knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.    Prudential paid defendant Scovanner the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $185,000 | $150,000 | $335,000 |

25.     Defendant Sandra Pianalto ("Pianalto") is a Prudential director and has been since July 2015.  Defendant Pianalto knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Prudential to make improper statements in the Company's press releases and

public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP. In addition, defendant Pianalto knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices. Prudential paid defendant Pianalto the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $153,750 | $150,000 | $2,600 | $306,350 |

26.     Defendant Peter R. Lighte ("Lighte") is a Prudential director and has been since March 2016. Defendant Lighte knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP. In addition, defendant Lighte knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices. Prudential paid defendant Lighte the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $150,000 | $150,000 | $300,000 |

27.     Defendant George Paz ("Paz") is a Prudential director and has been since March 2016. Defendant Paz is a member of the Company's Audit Committee and has been since at least March 2018. Defendant Paz knowingly, in bad faith, or in conscious disregard for his

duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.  In addition, defendant Paz knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.  Prudential paid defendant Paz the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $150,000 | $150,000 | $5,000 | $305,000 |

28.    Defendant Michael A. Todman ("Todman") is a Prudential director and has been since March 2016.  Defendant Todman knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.  In addition, defendant Todman knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.   Prudential paid defendant Todman the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $150,000 | $150,000 | $5,000 | $305,000 |

29.    Defendant John R. Strangfeld ("Strangfeld") was Prudential's Non-Executive Chairman of the Board from November 2018 to April 2019.  He was also Prudential's Chief

Executive Officer, President, and director from January 2008 to November 2018; Chairman of the Board from May 2008 to November 2018; Vice Chairman of the Board from August 2002 to December 2007; Executive Vice President from February 2001 to August 2002; Chief Executive Officer of Prudential Investment Management from October 1998 to April 2002; and held various other positions since joining the company in July 1977. Defendant Strangfeld knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP. In addition, defendant Strangfeld knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices. Prudential paid defendant Strangfeld the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | All Other Compensation | Total |
|---|---|---|---|
| 2019 | $375,000 | $13,492 | $388,492 |

30.    Defendant Mark B. Grier ("Grier") was a Prudential director from December 1999 to January 2001 and January 2008 to August 2019. He was also Prudential's Vice Chairman of the Board from August 2002 to December 2018; Executive Vice President from December 2000 to August 2002; Vice President from January 2000 to December 2000; Chief Financial Officer of Prudential Insurance from May 1995 to June 1997; and has held various other management positions at Prudential and Prudential Insurance since joining the Company in May 1995. Defendant Grier knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to make improper statements in the Company's press releases and public filings concerning: (i) the sufficiency of the Company's reserves; (ii) Prudential's mortality

issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP.  In addition, defendant Grier knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Prudential to repurchase the Company's stock at artificially inflated prices.  Prudential paid defendant Grier the following compensation as a director and an executive:

| Year | Salary | Bonus | Option Awards | Non-Equity Incentive Plan | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other | Total |
|---|---|---|---|---|---|---|---|
| 2019 | $853,596 | $4,800,011 | $1,606,425 | $6,791,562 | $2,872,032 | $255,609 | $17,179,235 |

31.     The defendants identified in ¶¶16-18, 30 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶16-17, 19-30 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶23-24, 27 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶16-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

32.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Prudential and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Prudential in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Prudential and not in furtherance of their personal interest or benefit.

33.     To discharge their duties, the officers and directors of Prudential were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Prudential were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements, including requirements involving the filing of accurate financial and operational information with the SEC;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Prudential conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Breaches of Duties**

34.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Prudential, the absence of good faith on their part, and a reckless disregard for their duties to the Company that

the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

35.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to disseminate improper statements to the public.  These improper practices wasted the Company's assets, and caused Prudential to incur substantial damage.

36.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Prudential, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Prudential has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

37.     In addition to these duties, under its Charter, the Audit Committee Defendants, defendants Hund-Mejean, Scovanner, and Paz, owed and owe specific duties to Prudential to assist the Board in overseeing: (i) "the integrity and audit of the Company's financial statements"; (ii) "the Company's accounting, financial reporting and disclosure processes and the adequacy of the systems of disclosure and internal control"; (iii) the processes to provide compliance with legal and regulatory requirements; and (iv) "the performance of the Company's internal audit function."

38.     Under its Charter, the Audit Committee is required to "[r]eview and discuss with management": (i) "the Company's earnings releases, including the use of 'pro forma' or 'adjusted' non-GAAP information, as well as financial information and earnings guidance provided to

analysts and rating agencies"; (ii) "the Company's annual financial statements, disclosures made in 'Management's Discussion and Analysis of Financial Condition and Results of Operations,' and all required management certifications prior to the filing with the SEC of the related Form 10-K"; and (iii) reports regarding the effectiveness of the Company's internal controls over financial reporting, including any significant deficiencies or material weaknesses.

39.     With respect to accounting and financial control matters, the Audit Committee Charter provides the Committee is required to "discuss any significant matters arising from any audit, including any audit problems or difficulties encountered in the course of the performance of the audit and management's response."

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

40.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Prudential regarding the Individual Defendants' management of Prudential's operations and the Company's business and future prospects; and (ii) enhance the Individual Defendants' executive and directorial positions at Prudential and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

42.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements and repurchase its own stock.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## LEGAL AND REGULATORY FRAMEWORK

45.     Consistent with their duties to safeguard the Company's legal and regulatory compliance, the Individual Defendants were required to ensure that Prudential's accounting practices complied with GAAP and SEC disclosure rules.[1]

---

[1] The SEC has delegated its authority to promulgate GAAP for public companies to the Financial Accounting Standards Board ("FASB").  The FASB's standards are generally contained within

46.     The applicable GAAP governing Prudential's obligation to adequately reserve for life insurance claims is ASC 944, Financial Services—Insurance.   Reserves for life insurance claims are included as liabilities for "future policy benefits" reported on the Company's balance sheet in its Quarterly Reports and Annual Reports filed with the SEC.   "Liability for Future Policy Benefits" is "[a]n accrued obligation to policyholders that relates to insured events, such as death or disability."   ASC 944-40-20.   According to Prudential, its reserves for future policy benefits for its Individual Life business segment primarily related to term, universal, and variable life products, and included reserves for claims reported but not yet paid and claims incurred but not yet reported.

47.     As specified by ASC 944, universal life, whole life, and term life insurance policies are long-duration contracts, meaning they remain in force for an extended period of time.   ASC 944-40-25 sets forth guidance for establishing liabilities or reserves for future policy benefits on long-duration contracts.   In particular, ASC 944-40-25-7 and 944-40-25-8 state:

> **944-40-25-7** A liability for expected costs relating to most types of long-duration contracts shall be accrued over the current and expected renewal periods of the contracts.

> **944-40-25-8** The present value of estimated future policy benefits to be paid to or on behalf of policyholders less the present value of estimated future **net premiums** to be collected from policyholders—that is, a **liability for future policy benefits**—shall be accrued when premium revenue is recognized.

48.     ASC 944-40-30-6 further provides that liabilities accrued under ASC 944-40-25-8 must account for certain key assumptions, including mortality.   Mortality is "[t]he relative incidence of death in a given time or place" while mortality risk is "[t]he obligation to make

---

the FASB Accounting Standards Codification ("ASC").   SEC Regulation S-X Rule 4-01, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that do not conform to GAAP are presumptively misleading regardless of footnotes or other disclosures.

payments that are contingent upon the death or continued survival of a specific individual or group." ASC 944-40-20.

49.     Thus, the Individual Defendants were required to ensure that Prudential used appropriate GAAP assumptions and adequately reserved for its future policy benefits, and the assumptions used to project future payment obligations such as mortality rates directly impact required reserves.

50.     In order to establish reliable GAAP assumptions, the Company must use known and current experience, as well as actuarial methods and assumptions, to ensure the adequacy of reserves for future policy benefits.   According to Prudential, the assumptions used for establishing future policy benefits, including mortality, are based on the Company's experience and industry experience.[2]  Under GAAP, Prudential is required to "regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised."  ASC 944-40-35-9.  GAAP further requires the Company to recognize material changes resulting from new experience and trends in the period in which the changes occurred.  ASC 944-40-35-6.

51.     The Individual Defendants were also required to disclose Prudential's exposure to additional liabilities in its Individual Life segment due to known negative mortality trends. Under ASC 450, Contingencies, estimated life insurance claims and reserves constitute a type of loss contingency, or "[a]n existing condition, situation, or set of circumstances involving uncertainty as to [a] possible ... loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."  ASC 450-10-20.  An accrual for a loss contingency

---

[2] "Mortality assumptions used in estimating the liability for future policy benefits shall be based on estimates of expected mortality."  ASC 944-40-30-11.

(i.e., a reserve or liability) and related loss provision (i.e., a charge to income or expense) must be made when (i) "[i]nformation available … indicates that it is probable that an asset had been impaired or a liability had been incurred"; and (ii) "[t]he amount of loss can be reasonably estimated."  ASC 450-20-25-2.[3]  Disclosure of the nature and amount of a loss contingency is required when it is at least reasonably possible that a loss will be incurred.  ASC 450-20-50-3.

52.     SEC Staff Guidance, Staff Accounting Bulletin Topic 5.W ("SAB Topic 5.W") is quoted in ASC 944-40-S99-1 and provides guidance for assessing uncertainties with respect to insurance reserves under ASC 450.   As stated in SAB Topic 5.W: "specific uncertainties (conditions, situations and/or sets of circumstances) not considered to be normal and recurring because of their significance and/or nature can result in loss contingencies" under ASC 450. These include "significant risks to an individual claim or group of related claims."  SAB Topic 5.W.   Disclosures regarding significant estimates should be made when "[i]t is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events … [and] the effect of the change would be material to the financial statements."  SAB Topic 5.W.

## THE INDIVIDUAL DEFENDANTS' IMPROPER STATEMENTS

53.     From February 15, 2019 to August 2, 2019, the Individual Defendants disseminated a series of improper statements in Prudential's public filings with the SEC, during earnings conference calls, and during meetings and other conversations with analysts.   In particular, these fiduciaries represented that: (i) Prudential's reserves were sufficient, and, if

---

[3] When a probable or likely loss is not accrued because a reasonable estimate cannot be made, then the Company is required to disclose such conditions.  ASC 450-20-50-5.

anything, greater than necessary; (ii) there were no systemic mortality issues; (iii) the negative mortality development was a mere possibility; (iv) the variation of Individual Life mortality was "normal" and within the range of expectations; (v) Prudential's financial condition and outlook was positive, with a "rock-solid" balance sheet; and (vi) the Company's reported reserves and financial results complied with GAAP.

54.     On February 15, 2019, Prudential filed its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Form 10-K") with the SEC.  The 2018 Form 10-K was signed by defendants Lowrey, Tanji, Poon, Casellas, Krapek, Baltimore, Hund-Mejean, Scovanner, Pianalto, Lighte, Paz, Todman, Strangfeld, and Grier.  In the 2018 Form 10-K, the Individual Defendants confirmed and repeated Prudential's previously announced financial results for the fourth quarter of 2018, including net income of $842 million and EPS of $1.99. For the full year, Prudential reported net income of $4.08 billion and EPS of $9.50.

55.     As for the Individual Life business segment, the 2018 Form 10-K reported a fourth quarter adjusted operating loss of $26 million and full year AOI of $223 million. Comparing the segment's performance to the previous year, the 2018 Form 10-K disclosed that Individual Life had incurred a $65 million reserve increase as a result of the annual assumption review that incurred in the second quarter of 2018, but did not mention any subsequent negative mortality developments.  In particular, the 2018 Form 10-K stated:

> *2018 to 2017 Annual Comparison.* Adjusted operating income increased $414 million, primarily reflecting favorable comparative net impacts from our annual reviews and update of assumptions and other refinements. Results for 2018 included a $65 million net charge from this annual review, mainly driven by unfavorable impacts related to lapse and mortality rate assumptions.

56.     The 2018 Form 10-K also stated that the methodology Prudential used to determine reserves, including mortality assumptions, was based on the Company's experience and complied with GAAP.  Specifically, the 2018 Form 10-K stated:

> We establish reserves for future policy benefits to, or on behalf of, policyholders using methodologies prescribed by U.S. GAAP.
>
> *       *       *
>
> The assumptions used in establishing reserves are generally based on the Company's experience, industry experience and/or other factors, as applicable.

57.     The Individual Defendants further stated in the 2018 Form 10-K that although assumptions such as mortality are typically updated annually, adjustments would be made in an interim period if a material change occurred; however, they stated the Company did not expect any significant changes in the short-term, and therefore did not expect short-term changes in reserves.  These fiduciaries also assured that even if a change in short-term trends arose, Prudential expected the changes to be gradual over the long-term.  In particular, the 2018 Form 10-K stated:

> We typically update our actuarial assumptions, such as ***mortality***, morbidity, retirement and policyholder behavior assumptions, annually, ***unless a material change is observed in an interim period that we feel is indicative of a long-term trend***. Generally, ***we do not expect trends to change significantly in the short-term*** and, to the extent these trends may change, ***we expect such changes to be gradual over the long-term.***

58.     In discussing the sufficiency of the Company's current reserves to satisfy future policyholder obligations, the Individual Defendants claimed that there was a "likelihood" that Prudential was "over-reserved" in light of low interests rates, thus indicating that Prudential was conservative in presenting its financial statements and potentially more profitable than represented.  Specifically, the 2018 Form 10-K stated:

> *In a sustained low interest rate environment, there is an increased likelihood that the reserves determined based on best estimate assumptions may be greater than the net liabilities*.

59.     In addition, the 2018 Form 10-K warned that "if" changes in mortality trends occurred, such changes would be long-term and emerge gradually, and could necessitate an increase in reserves.  However, the Individual Defendants failed to disclose that such risk had already transpired.  In particular, the 2018 Form 10-K stated:

> *Mortality trend* is the risk that mortality improvements in the future deviate adversely from what is expected. ***Mortality trend is a long-term risk in [sic] that can emerge gradually over time***. ... ***If this risk were to emerge,*** the Company would update assumptions used to calculate reserves for in-force business, which may result in additional assets needed to meet the higher expected annuity claims or earlier expected life claims

60.     Finally, the 2018 Form 10-K contained the signed certifications of defendants Lowrey and Tanji pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting that the report fairly presented Prudential's financial condition and operation, did not contain any material misrepresentations or omissions, and that the financial statements complied with GAAP.

61.     Following the 2018 Form 10-K, Prudential's stock price rose to an artificially inflated high of over $95 per share.

62.     On February 20, 2019, Sandler O'Neill + Partners, L.P. issued a report on the Company titled "Thoughts Following Meeting with Management – Maintaining BUY Rating," reporting on a meeting with management (including defendants Lowrey and Falzon) held the previous day.  In presenting Prudential's expectations for upcoming initiatives, the report included a reduction in negative accounting adjustments leading to increased volatility and reduced earnings.  According to the Company, new initiatives would reduce negative adjustments and improve its stock price.  Specifically, the report stated:

**At the June 2019 investor day, investors should expect metrics to be laid out by which success of the financial wellness program can be judged.** ... The company believes the financial wellness program as well as some other initiatives being pursued ***should lead – over time – to valuation improvement in the stock from***: 1) ***a consistency of earnings (i.e. less earnings volatility)***[.]

63.     On March 31, 2019, Credit Suisse Securities (USA) LLC issued a report commenting on its meetings with Prudential management, including defendant Falzon, on March 28, 2019.  The report, titled "Mgmt. Meeting Highlights Positive Outlook," observed that the Company was comfortable with its 2019 EPS outlook of between $12.50 and $13 per share, and stated that defendant Falzon was "optimistic about [its] growth prospects[.]"  The report further noted that defendant Falzon assured investors that there were "no systemic issues with underwriting or mortality assumptions, and that results should stabilize" in the Individual Life segment.  In particular, the report stated:

> Mr. Falzon was optimistic about growth prospects at PRU....  He cited PRU's ability to accelerate execution and thus growth via integration of its U.S. Financial Wellness platform, which involves its Retirement Services, Group Insurance, Annuities, and Individual Life businesses.

*     *     *

***Mr. Falzon noted that there are no systemic issues with underwriting or mortality assumptions, and that results should stabilize***.

64.     Prudential's stock price climbed following analyst management meetings, to close at an artificially inflated high of over $104 per share on April 16, 2019.

65.     On May 1, 2019, Prudential issued a press release announcing its financial results for the first quarter ended March 31, 2019.  These results included EPS of $3 per share, falling below analyst expectations.  Nonetheless, in the press release, defendant Lowrey assured that the

Company's balance sheet, including assets and liabilities, was "rock-solid."[4]   Specifically, the press release stated:

> *Net income attributable to Prudential Financial of $932 million or $2.22 per Common share versus $1.363 billion or $3.14 per share for the year-ago quarter.*
>
> \*        \*        \*
>
> "With a foundation of a rock-solid balance sheet, we continued to return capital totaling $915 million to shareholders via share repurchases and dividends."

66.     The press release also emphasized that the results for the Individual Life segment included an AOI of $105 million, an impressive increase compared to the same quarter the previous year.  In particular, the press release stated:

> *The Individual Life segment reported adjusted operating income of $105 million for the current quarter*, compared to $36 million in the year-ago quarter. Underwriting experience in the current quarter was consistent with our seasonal expectation.

67.     The following day, on May 2, 2019, the Company held an earnings conference call with analysts and investors to discuss its financial results for the first quarter of 2019. During the conference call, Prudential's fiduciaries reiterated the previously announced financial results, with defendants Tanji and Lowrey touting the strength of the Company's balance sheet and current mortality trends to provide a positive financial outlook.  Specifically, defendants Tanji and Lowrey stated:

> [Defendant Tanji:] [U]nderwriting experience was in line with our seasonal expectations and *reflects the benefit of our complementary mortality*[.]

---

[4] A company's balance sheet gives a snapshot of its assets, liabilities, and shareholders' equity, providing a basis for computing rates of return at a specific point in time.  *See* Adam Hayes, *Balance Sheet*, Investopedia (May 13, 2020) investopedia.com/terms/b/balancesheet.asp.

*     *     *

*We also maintained a strong balance sheet*.

*     *     *

[Defendant Lowrey:] [T]he scale of our businesses and the **strength of our balance sheet** ... **should lead to growth in our businesses and greater value for our shareholders**.

68.    On May 2, 2019, Morgan Stanley & Co. LLC issued a report titled "Results Miss, Mostly Due to Market Influence," explaining that management attributed the earnings miss to the strong performance of the stock market rather than to any performance issues specific to Prudential.  In addition, the report stated that these impacts were already priced into the stock.  In particular, the report stated:

> *Earnings ran considerably below, although it mostly reflected escalated pension expenses due to strength in the equity markets*.

> **Investment Thesis**: Prudential has a track record of delivering strong, broad-based growth and returns, with core results typically hitting or exceeding expectations. But for the second quarter in a row, results ran considerably shy of expectations. While last quarter management put the weakness down to seasonality and the impact of weak equity markets, *this quarter they put the shortfall mostly to pension and retirement expenses related to the strength in the equity markets*.

> *     *     *

> *We continue to see Prudential as having a strong franchise and would recommend investors be buyers on weakness*[.]

69.    Prudential's stock price continued to trade at artificially inflated prices following the announcement of its first quarter 2019 results, with rates exceeding $100 per share.

70.    On May 3, 2019, Prudential filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q") with the SEC.  The Q1 2019 Form 10-Q reiterated the previously announced financial results while attributing the performance of

the Individual Life segment to a purportedly "favorable impact from mortality experience[.]" Specifically, the Q1 2019 Form 10-Q stated:

> Adjusted operating income increased $69 million, primarily reflecting a favorable comparative net impact of $49 million from changes in our estimated profitability of the business driven by equity market performance on policyholder accounts. Excluding this impact, **adjusted operating income increased $20 million, primarily reflecting higher underwriting results driven by a favorable impact from mortality experience**, net of reinsurance.

71.     The Q1 2019 Form 10-Q contained the signed certifications of defendants Lowrey and Tanji pursuant to SOX attesting that the report fairly presented Prudential's financial conditions and operations, did not contain any material misrepresentations or omissions, and that the financial statements complied with GAAP.

72.     With just three weeks left in the second fiscal quarter, on June 5, 2019, Prudential held an Investor Day conference to discuss the Company's financial condition and future prospects.   Defendants Lowrey, Tanji, and Falzon each presented to investors during the conference, with defendant Tanji commenting on the status of Prudential's annual second quarter actuarial update.   Defendant Tanji assured investors that current mortality, although "slightly" negative, was within normal expectations, thus indicating no material reserve charge was within the near future.   In particular, defendant Tanji stated:

> And then the third area which can lead to quarter-to-quarter volatility is updates of our insurance reserves for both market and actuarial assumptions. And this is where even small adjustments to our long term reserves can cause our earnings to vary in a certain period. So, over the short term, these items can vary quarter-to-quarter.

*      *      *

> **And then the third area of interest is about -- involves our individual life business and our mortality experience. And our recent experience has been within range of what we'd expect normal volatility would be, but net it has been below our experience**.

*       *       *

[Analyst:] *And then when you're going through the assumption review commentary, you talked about the life business. And I just wondered, I missed what you've said. Has mortality been more favorable is that relative to what your expectations are* or . . . ?

[Defendant Tanji:] No. *It has varied quarter-to-quarter, both positive and negative*. If you looked at it, it has been *slightly negative and we're taking a look at that*.

73.    On June 17, 2019, Barclays Research issued a report on investor meetings with the Company's management that took place during the week of June 10, 2019. The report, titled "PRU Meeting Takeaways: Favorable Outlooks Despite Rate Headwinds," commented that management was positive in Prudential's growth prospects and expected Financial Wellness (including Individual Life) to deliver near-term earnings growth. Specifically, the report stated:

> *PRU's overall tone was positive in terms of its ability to generate solid revenue growth and margin expansion* in PGIM (asset management) and *the US Financial Wellness businesses (individual life*, annuities, retirement, group products) [.]
>
> *       *       *
>
> Prudential targets intermediate-term adjusted EPS growth in the high-single digits range.... *The US financial wellness businesses* and PGIM *are expected to deliver near-term earnings growth in the mid-to-high single digits*.

## REASONS THE STATEMENTS WERE IMPROPER

74.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)    the legacy Hartford life block routinely missed internal performance expectations due to adverse mortality development, thus negatively impacting the overall financial performance of the Individual Life segment;

- 30 -

(b)      the underwriting of the longer dated vintages of the universal life business (i.e., the legacy Hartford policies) was inadequate;

(c)      Prudential was experiencing highly unusual, material adverse mortality development in Individual Life and needed to take a material adverse reserve charge as a result;

(d)      the Company was unable to accurately reserve for the legacy Hartford life block, failed to account for adverse quarter-over-quarter mortality experience, and failed to adequately reserve for current and future policy benefits liability, thus understating liabilities while overstating net income and EPS; and

(e)      as a result of the foregoing, the Company's reserves and financial results, including net income, operating earnings, and EPS were misstated and violated GAAP and SEC disclosure rules.

## **THE TRUTH EMERGES**

75.      The truth about the Individual Life segment began to emerge on July 31, 2019, as the Company issued a press release announcing its financial results for the second quarter ended June 30, 2019, including EPS of $3.14, falling below analyst estimates of $3.23, or a miss of $39 million.  Driving this miss, Prudential reported that the Individual Life segment had lost $135 million during the quarter against expected income of $108 million resulting from a pre-tax charge of $208 million due to unfavorable updates to mortality assumptions.  In particular, the press release stated:

- Net income attributable to Prudential Financial of $708 million or $1.71 per Common share versus $197 million or $0.46 per share for the year-ago quarter. ***The current quarter included a net after-tax charge from our annual reviews and update of assumptions and other refinements of $32 million or $0.08 per Common share*** versus $1.5 billion or $3.40 per share in the year-ago quarter.

- After-tax adjusted operating income of $1.307 billion or $3.14 per Common share versus $1.298 billion or $3.01 per share for the year-ago quarter. *The current quarter included a net after-tax charge from our annual reviews and update of assumptions and other refinements of $39 million or $0.09 per Common share* versus $126 million or $0.29 per share in the year-ago quarter.

\* \* \*

**Individual Life Segment:**

- ***Reported an adjusted operating loss of $135 million in the current quarter***, compared to operating income of $43 million in the year-ago quarter. ***This decrease includes a more unfavorable comparative impact from our annual reviews and update of assumptions and other refinements of $153 million***.

\* \* \*

"Although the recent decline in interest rates and ***our revised mortality assumptions may trim near-term earnings momentum***...."

76.     This $208 million charge was extremely unusual because, according to Prudential's stated sensitivity analysis, a one standard deviation change from expected mortality experience would impact annual pre-tax AOI by $55 million to $80 million.   Thus, the Company's mortality volatility was anything but "normal."

77.     Given Prudential's positive assurances during its June 5, 2019 Investor Day conference, these results surprised analysts.   On July 31, 2019, UBS Securities LLC issued a report criticizing management for failing to disclose the negative development at the Investor Day in order to "reset expectations."   Specifically, the report stated:

**Reported and Core EPS Below Expectations**

PRU reported 2Q19 Op. EPS of $3.14, well below our $3.25 estimate and consensus $3.23.  ...  Adjusting for these, Core EPS was $3.08 vs. our $3.20[.]

\* \* \*

***[W]e think mgmt should have used its June investor day to lay out the new disclosure and reset the bar at that point***.

78.     Wells Fargo Securities, LLC ("Wells Fargo") also issued a report on July 31, 2019, commenting that Prudential's poor results came as a surprise "since this came so close to its investor day" and predicting that its stock price will likely fall in the following days.   In particular, the report stated:

> **Summary**. PRU reported Q2 2019 adjusted operating EPS of $3.14, in line with our estimate, but below the $3.23 consensus.  ... *We think PRU shares likely trade down Thursday (8/1)* as the base-line EPS number for Q3 (of $3.00) is below expectations and *investors will most likely be surprised since this came so close to its investor day in June*.

79.     The following day, on August 1, 2019, the Company held an earnings conference call with analysts and investors to discuss its financial results for the second quarter of 2019, including the $208 million charge to the Individual Life segment's earnings.   During the call, Prudential's fiduciaries explained the mortality assumption update would impact future earnings in addition to quarterly results.   Specifically, defendant Lowrey stated:

> In the near term, however, we expect several factors to impact our level of earnings … [including] this quarter's assumption update in Individual Life reduced future earnings.

80.     Defendant Lowrey also conceded that internal forecasts were inconsistent with external expectations and needed to be better aligned with those expectations.   He added that changes were made in order to give investors visibility into expected results.   In particular, defendant Lowrey stated:

> As we said during our last call and on Investor Day, we're also very focused on connecting our track record of operating fundamentals with commensurate financial outcomes. … *But part of this relates to better aligning external expectations with our internal forecast*, and part of this call is focused on trying to do that. As a result, *we enhanced our disclosures this quarter to help give you better visibility on our expected results*, and Ken will cover this in more detail.

81.     During the question and answer session, analysts asked for details concerning the surprisingly poor financial results and the reserve charge in Individual Life resulting from changed mortality assumptions, including whether and how future results would be impacted. Defendant Tanji responded that the actuarial review went beyond the $208 million charge and that future earnings would be negatively impacted by $25 million per quarter for the foreseeable future.  Specifically, analysts asked and defendant Tanji responded:

> [Analyst:] So looking at Slide 7, you've baselined the earnings at $3, would annualize to $12. This implies significant reduction from the $12.75 midpoint guidance you provided at the outlook call. Now in your prepared remarks, you highlighted a number of factors behind that, but hoping you can run through each of those into more detail?

> [Defendant Tanji:] Yes, sure. This is Ken. So we don't want to update guidance, but what I thought I could do is highlight a few **items to consider that were not in our guidance that we gave last December**.  ...  **We also updated this quarter our mortality assumptions in Individual Life, and that will have an ongoing impact into the second quarter**.

> \*        \*        \*

> [Analyst:] And just to be -- make sure we have it correct, what would you sizes that ongoing impact for Individual Life? And is it something that should persist into perpetuity?

> [Defendant Tanji:] Yes, **it's about $25 million a quarter. And it would be reoccurring for the foreseeable future**.

82.     Prudential Executive Vice President and Chief Operating Officer of U.S. Businesses Stephen Pelletier ("Pelletier") also revealed in response to analyst questioning that "longer-dated vintages" (i.e., the Hartford life block) were what required the reserve increase and that the policies had outdated underwriting policies that were not up to current standards.  In particular, analysts asked and Pelletier responded:

> [Analyst:] I just wanted to come back to the mortality topic. And I was curious, is the deterioration related to any specific vintages or types of policies? Are you really reflecting a broader trend?

[Pelletier:] ***The main point is that the updates really related to the longer-dated vintages, earlier vintages in our book of business. In regard to looking at specific product categories, the onetime impact is largely experienced in the Universal Life block.***

\*      \*      \*

[Analyst:] And then as you mentioned potential in-force actions as one of the possible offsets, can you expand in terms of what you might be contemplating there?

[Pelletier:] In Individual Life, we're looking at 3 main drivers in an effort to improve returns in that business over the next few years. ... ***The new business that we've been writing over the last few years***, I should point out, ***has been priced using much more current assumptions that are very different from the assumptions used to price the legacy products that have generated some of the recent charges we've taken***.

83.    On August 1, 2019, JPMorgan Chase & Co. issued a report on Prudential titled

"***2Q Results Poor, 3Q Guidance Atrocious***" and commenting that it considered

"***mortality/morbidity variances … a core part of the company's operations***."  The report went

on to note that as a result of the actuarial review, Individual Life's income would be reduced by

one third in 2020.   In addition, JPMorgan Chase & Co. attributed the charge to negative

mortality development in the legacy Hartford life block.  Specifically, the report stated:

Yesterday evening, PRU announced 2Q19 operating EPS of $3.14. Results were affected by a few unusual items, adjusted for which we estimate that the company would have earned $3.06, below our $3.14 estimate and consensus of $3.22.

\*      \*      \*

**U.S. Individual Solutions: Weak Results, Outlook Cautious**

**Operating trends in the U.S. individual solutions business were weak, affirming our negative outlook for the business.  ... *Also, the individual life business incurred a balance sheet charge as part of PRU's assumption review. Management expects the change in assumptions related to the actuarial review to reduce future annual income in the individual life business by roughly $96 million, close to a third of our previously assumed earnings for the business in 2020*.**

* * *

**Individual Life: Earnings Hurt by Reserve Charge; Outlook Negative**

***The individual life business reported a loss of $135 million versus expected earnings of $74 million***. ... Individual life earnings have dropped by almost half compared to four years ago, ***and we expect them to drop by another third due to updated reserving patterns as part of the 2019 actuarial review***. Prudential's individual life business has incurred significant charges as part of the actuarial review process in each of the past 3 years (including 2019). ... ***We attribute the poor performance of the individual life business partly to weak results in the legacy Hartford life block*** that Prudential acquired in 2015 [*sic*].

84.    On the news of the earnings miss, $208 million reserve charge, and negative $25 million quarterly impact for the foreseeable future, Prudential's market capitalization fell by over 10%, or $10.22 per share on August 1, 2019, to close at $91.09 per share compared to the previous trading day's closing of $101.31 per share, erasing over $4.1 billion in market capitalization in a single day.

85.    Wells Fargo issued another report following the Company's earnings conference call on August 2, 2019, titled "PRU: A Rocky Day; Conference Call Round-Up," which downgraded its earnings estimates for the remainder of 2019 and through 2021, and also slashed its price target from $115 to $105  The report noted that it was the assumptions "used on the legacy products that have caused the recent charges" in Individual Life and further stated that "[t]he deterioration in mortality was principally concentrated within the Universal life business for longer-dated vintages."

86.    On August 2, 2019, RBC Capital Markets, LLC issued a report expressing disappointment about Prudential's third-quarter guidance reduction and the $25 million quarterly impact of mortality adjustments spilling into 2020 estimates.  The report also lowered its 2019 and 2020 earnings estimate and target stock price.  In particular, the report stated:

**Our view**: We didn't love the quarter.... ***We definitely didn't love the reduced guidance for the third quarter and the various guidance items that spill into 2020 estimates***.

\*     \*     \*

**Estimates & PT:** We've lowered our 2019 estimate to $12.00 from $12.60. Many of the adjustments also impacted 2020 estimates which we lower from $13.75 to $13.00. We are initiating a 2021 estimate of $14.25.

We reduce our price target to $110 from $120.

\*     \*     \*

**Actuarial review**: In the aggregate the review netted to a $49 million net charge. ***The two notable items were a $208 million charge to the individual life business.... The adjustment to the individual life business will have an ongoing impact to earnings of about $25 million per quarter. It primarily related to mortality assumptions within longer dated vintages of universal life business***.

87.     After market close on August 2, 2019, Prudential filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q") with the SEC.  The Q2 2019 Form 10-Q detailed Prudential's adjustments to operating income by segment and reported that Individual Life performed $178 million worse during the quarter compared to the previous year, primarily because of the $208 million reserve charge driven by negative mortality assumptions during the annual review.  Specifically, the Q2 2019 Form 10-Q stated:

> *Three Month Comparison*. Adjusted operating income decreased $178 million, primarily reflecting an unfavorable comparative net impact from our annual reviews and update of assumptions and other refinements. ***Results for the second quarter of 2019 included a $208 million net charge from this annual review, mainly driven by unfavorable impacts related to mortality rate assumptions***.

88.     On this news, Prudential's stock price dropped to close at $88.56 per share on August 2, 2019, compared to the previous day's closing of $91.09 per share.  In total, Prudential's stock price declined by over 16%, or $17.15 per share, from its April 2019 high of $105.71 per to

its low on August 2, 2019, erasing over **$7.31 billion** in market capitalization.  The Company's stock price further fell in the days that followed, to close at $85.95 per share on August 5, 2019.

89.     Peculiarly, the Company's Investor Relations had been communicating with sell-side analysts concerning Prudential's financial models "[i]n an effort to be more transparent," as revealed a Deutsche Bank Securities Inc. ("Deutsche Bank") report issued on August 6, 2019. Though the report did not specifically state what information was revealed, based on additional communication from Investor Relations, Deutsche Bank reduced its 2019 EPS guidance by over 4% to $12.25.  The report stated:

> We are updating our model to reflect 2Q19 earnings. ***In an effort to be more transparent, IR has been reaching out to the sell-side to discuss modeling considerations, particularly given newer disclosures***. Management had set 3Q19 "baseline" EPS at $3.00 (relative to the $3.14 reported in 2Q19) resulting from backing out a $0.09/sh benefit from the assumption review, offset by $0.17/sh in higher-than-average VII and $15mn of earnings headwinds in each Gibraltar and Corporate.
>
> *      *      *
>
> ***Further, updated mortality assumptions based on the annual review is expected to lower Individual Life earnings by $25mn/quarter for the foreseeable future***[.]

90.     Prudential's stock price further dwindled following this news, to close at just $80.09 per share on August 15, 2019.

## THE INDIVIDUAL DEFENDANTS CAUSE PRUDENTIAL TO REPURCHASE ITS STOCK AT ARTIFICIALLY INFLATED PRICES

91.     While the Company's stock traded at artificially inflated rates due to their improper statements from February 15, 2019 to August 2, 2019, the Board approved repurchases of the Company's common stock that substantially damaged Prudential.   In particular, in December 2018, the Board authorized the repurchase of up to $2 billion of outstanding common stock during the period from January 1, 2019 to December 31, 2019.

92.     In total, the Company spent an aggregate amount of over $1.07 billion to repurchase 10.97 million shares of its own common stock at artificially inflated prices from February 2019 to July 2019, at an average price of $97.54 per share, as detailed by the table below:

| Period | Repurchased Shares | Average Price Per Share | Weighted Average Calculation | Approximate Aggregate Cost |
|---|---|---|---|---|
| | | | | |
| Feb-19 | 2,526,741.0 | $92.99 | $21.41 | $234,961,646 |
| Mar-19 | 1,771,474.0 | $94.29 | $15.22 | $167,032,283 |
| Apr-19 | 1,657,498.0 | $100.74 | $15.22 | $166,976,349 |
| May-19 | 1,681,255.0 | $99.22 | $15.20 | $166,814,121 |
| Jun-19 | 1,693,860.0 | $98.76 | $15.24 | $167,285,614 |
| Jul-19 | 1,642,397.0 | $101.82 | $15.24 | $167,228,863 |
| | 10,973,225.0 | | $97.54 | $1,070,298,875 |

93.     Through the repurchases, the Director Defendants signaled to the market that they believed Prudential's shares were undervalued and that the repurchases were the best use of the Company's cash.   Because share repurchases lower the number of outstanding shares, the repurchases also increased the Company's EPS, return on equity, return on assets, and other metrics.   Collectively, these actions artificially inflated Prudential's share price with each repurchase, and increased the price for each subsequent repurchase.

94.     When the truth about the adverse mortality assumptions and ongoing negative earnings impact fully emerged, Prudential's stock price fell to approximately $88.56 per share. As a result, the 10.97 million shares the Company repurchased between February 2019 and July 2019 were worth approximately $971.78 million, or approximately 10% less than what the Company paid for them, an overpayment of approximately ***$98.51 million***.

## DAMAGES TO PRUDENTIAL

95.     As a result of the Individual Defendants' improprieties, Prudential disseminated improper, public statements concerning (i) the sufficiency of the Company's reserves; (ii)

Prudential's mortality issues; (iii) the possibility of negative mortality development; (iv) the variation of Individual Life mortality; (v) Prudential's financial condition and future prospects; and (vi) Prudential's compliance with GAAP. These improper statements have devastated Prudential's credibility as reflected by the Company's almost $7.31 billion, or 16%, market capitalization loss from its April 2019 high to its August 2019 low.

96. Prudential's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Prudential's current and potential customers consider a company's ability to accurately value its business operations and future prospects and evaluate sales and growth potential. Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions, and investors are less likely to invest in companies that fail to timely disclose material information. Prudential's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

97. Further, as a direct and proximate result of the Individual Defendants' actions, Prudential has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement or adverse judgment in the Securities Class Action;

(b) excessive sums paid to repurchase Prudential's stock at artificially inflated prices;

(c) costs incurred from investigating wrongdoing; and

(d)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to the Company.

## **DERIVATIVE AND DEMAND ALLEGATIONS**

98.      Plaintiff brings this action derivatively in the right and for the benefit of Prudential to redress injuries suffered, and to be suffered, by Prudential as a direct result of violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Prudential is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.      Plaintiff will adequately and fairly represent the interests of Prudential in enforcing and prosecuting its rights.

100.     Plaintiff was a stockholder of Prudential at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Prudential stockholder.

101.     On April 14, 2020, plaintiff sent the Demand to the Board in accordance with New Jersey law.[5]  In the Demand, plaintiff explained that the Individual Defendants breached their fiduciary duties to the Company for the reasons detailed herein.  Plaintiff demanded the Board to investigate and remedy the wrongdoing detailed in the Demand, including commencing legal proceedings against those responsible.

---

[5] A true and correct copy of the Demand is attached hereto as Exhibit A.

102.    In response to the Demand, plaintiff's counsel received a letter dated April 27, 2020, from outside counsel to the Board.[6]  In the letter, counsel represented that the Board formed a Special Committee to investigate the Demand's allegations and asked for documents demonstrating plaintiff continuously owned Company stock during the time of the wrongdoing detailed in the Demand.  In particular, counsel claimed that a demanding shareholder is required to provide "evidence" that "not only show[s] that it is currently a shareholder, but also that it was shareholder at the time of the conduct about which it complains."  However, New Jersey law contains no such requirement that a shareholder provide proof of continuous stock ownership as a prerequisite to a litigation demand.  N.J.S.A. 14A:3-6.3.

103.    On April 28, 2020, plaintiff's counsel sent a letter to the Board's counsel furnishing the requested proof by attaching plaintiff's redacted brokerage statement.[7]  Plaintiff's counsel also asked to be updated on when the Special Committee expects to complete its investigation.

104.    Under the New Jersey Business Corporation Act, a stockholder is permitted to commence a derivative proceeding if ninety days have expired from the date the stockholder made a written demand upon the corporation to take suitable action and the stockholder has not been earlier notified that the corporation rejected the demand.  N.J.S.A. 14A:3-6.3.  Over four months have passed since the date the Demand was made, yet the Board has failed to respond. Accordingly, plaintiff has satisfied New Jersey's demand requirement, and may pursue this action on behalf of the Company.

---

[6] A true and correct copy of the letter dated April 27, 2020, is attached hereto as Exhibit B.

[7] A true and correct copy of the letter dated April 28, 2020, is attached hereto as Exhibit C.

105.   Plaintiff has not made any demand on the other stockholders of Prudential to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   Prudential is a publicly held company with 395 million shares outstanding and thousands of stockholders as of July 31, 2020;

(b)   making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)   making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act**

106.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.   From February 15, 2019 to August 2, 2019, the Individual Defendants disseminated or approved false or misleading statements about Prudential, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and the Individual Defendants' course of conduct artificially inflated the price of the Company's common stock.

108.   At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, they caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to their false or misleading statements. The Individual Defendants engaged in a scheme to

defraud Prudential by causing the Company to purchase over $1.07 billion in shares of its stock at artificially inflated prices.

109.    The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Prudential in connection with the Company's purchases of its stock during the period of wrongdoing.

110.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Prudential stock, which were intended to, and did: (a) deceive Prudential and its stockholders regarding, among other things, the Company's operations and financial prospects; (b) artificially inflate and maintain the market price of Prudential stock; and (c) cause Prudential to purchase its stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the period of wrongdoing, the Individual Defendants were in possession of material, nonpublic information regarding the above.

111.    As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that they should have been aware of them. Throughout the period of wrongdoing, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

112.    The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase of the Company's stock by the Company itself.

113.    As a result of the Individual Defendants' misconduct, Prudential has and will suffer damages that it paid in artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

114.    Prudential would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

115.    By reason of the Individual Defendants' wrongful conduct, they are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

116.    Plaintiff brings this claim within two years of the discovery of the facts constituting the violation and within five years of the violation.

## <u>COUNT II</u>

### Against the Individual Defendants for Breach of Fiduciary Duty

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.   The Individual Defendants owed and owe Prudential fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe Prudential the highest obligation of care and loyalty.

119.   The Individual Defendants and each of them, violated and breached their fiduciary duties.

120.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the legacy Hartford life block routinely missed internal performance expectations due to adverse mortality development, thus negatively impacting the overall financial performance of the Individual Life segment; (ii) the underwriting of the longer dated vintages of the universal life business (i.e., the legacy Hartford policies) was inadequate; (iii) Prudential was experiencing highly unusual material adverse mortality development in Individual Life and needed to take a material adverse reserve charge as a result; (iv) the Company was unable to accurately reserve for the legacy Hartford life block, failed to account for adverse quarter-over-quarter mortality experience, and failed to adequately reserve for current and future policy benefits liability, thus understating liabilities while overstating net income and EPS; and (v) as a result of the foregoing, the Company's reserves and financial results, including net income, operating earnings, and EPS were misstated and violated GAAP and SEC disclosure rules.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

121.   The Director Defendants, as directors of the Company, owed Prudential the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.   The Director Defendants knew or were reckless in not

knowing that: (i) the legacy Hartford life block routinely missed internal performance expectations due to adverse mortality development, thus negatively impacting the overall financial performance of the Individual Life segment; (ii) the underwriting of the longer dated vintages of the universal life business (i.e., the legacy Hartford policies) was inadequate; (iii) Prudential was experiencing highly unusual material adverse mortality development in Individual Life and needed to take a material adverse reserve charge as a result; (iv) the Company was unable to accurately reserve for the legacy Hartford life block, failed to account for adverse quarter-over-quarter mortality experience, and failed to adequately reserve for current and future policy benefits liability, thus understating liabilities while overstating net income and EPS; and (v) as a result of the foregoing, the Company's reserves and financial results, including net income, operating earnings, and EPS were misstated and violated GAAP and SEC disclosure rules.  Accordingly, these defendants breached their duty of loyalty to the Company.

122.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

123.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Prudential has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

124.    Plaintiff, on behalf of Prudential, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    As a result of the wrongdoing detailed herein, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action that they brought on with their improper statements.  Further, as a result of the decision to allow the Company to operate with inadequate internal controls, the Individual Defendants have caused Prudential to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

127.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

128.    Plaintiff, on behalf of Prudential, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Prudential.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Prudential.

131.    Plaintiff, as a stockholder and representative of Prudential seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

132.    Plaintiff, on behalf of Prudential, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Prudential, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.    Directing Prudential to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Prudential and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over mortality assumptions and adjustments;

2.    a proposal to strengthen the Company's controls over financial reporting;

3.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

      4.      a provision to permit the stockholders of Prudential to nominate at least three candidates for election to the Board; and

      5.      a proposal to limit when Prudential will engage in repurchases to only those times the stock price accurately or trades at a discount to the Company's true value;

      C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Prudential has an effective remedy;

      D.      Awarding to Prudential restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

      E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

      Plaintiff demands a trial by jury.

Dated: September 16, 2020           **HERMAN JONES LLP**

                        /s/*Serina M. Vash*
                        SERINA M. VASH
                        (NJ Bar No. 041142009)
                        153 Central Avenue #131
                        Westfield, NJ 07090
                        svash@hermanjones.com
                        Telephone: (404) 504-6516
                        Facsimile: (404) 504-6501

                        ROBBINS LLP
                        BRIAN J. ROBBINS
                        CRAIG W. SMITH
                        STEVEN R. WEDEKING
                        5040 Shoreham Place

San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

1475333